| 12 | 121 |
|----|-----|
| d35 | 167 |

</div>

[No. 1713.  Decided June 19, 1895.]

RICHARD SCHMIDT, *Appellant*, v. THE CITY OF NORTH
YAKIMA, *Respondent*.

ACTION ON CONTRACT FOR CONSTRUCTION OF SEWER — ABSENCE OF EN-
GINEER'S CERTIFICATE — FRAUD OF CONTRACTOR.

Where payment to a contractor for the construction of a city sewerage system is made conditional upon the certificate of the city engineer that the work has been properly done, the contractor cannot recover upon the contract without producing such certificate, in

the absence of a showing that it has been withheld through the fraud or capriciousness of the engineer.

Where a contractor wilfully and fraudulently refuses to comply with the terms of his contract, in the construction of a sewerage system, but constantly and clandestinely employs inferior materials in its construction, much of which had been rejected or objected to by the city engineer in charge of the work, he is not entitled to recover on his contract.

*Appeal from Superior Court, Yakima County.*

*F. H. Rudkin, H. J. Snively* and *J. T. Ronald,* for appellant.

*Whitson & Parker,* and *Reavis & Englehart,* for respondent:

The production of the certificates provided for in the contract are a condition precedent to recovery. *Craig v. Geddis,* 4 Wash. 390; *Edison, etc., Co. v. Canadian Pac. Nav. Co.,* 8 Wash. 371 (40 Am. St. Rep. 910); *Brown v. Winehill,* 3 Wash. 524; *Martinsburg, etc., R. R. Co. v. March,* 114 U. S. 549; *Sweeney v. United States,* 109 U. S. 618; *Wangler v. Swift,* 90 N. Y. 38; *Hanley v. Walker,* 45 N. W. 57; *Hot Springs R. R. Co. v. Maher,* 3 S. W. 639; *U. S. Electric, etc., Co. v. Big Rapids,* 43 N. W. 1030. When a contractor has been guilty of fraud or has wilfully abandoned the work, he cannot recover in any form of action. *Dermott v. Jones,* 2 Wall. 1; *Lowber v. Bangs,* 2 Wall. 728; *Kihlberg v. United States,* 97 U. S. 398; *Hanley v. Walker,* 45 N. W. 57.

The opinion of the court was delivered by

DUNBAR, J.—The appellant entered into a written contract with respondent for the construction of a system of sewerage in the city of North Yakima. Contract and specifications are set forth in the pleadings. The work was to be done to the satisfaction of

and under the direction of the city engineer, and to be
testified by his certificate. Under the contract, in
case the contractor, at any time during the progress of
the work, refused or neglected to supply a sufficiency
of material, workmen, or implements to complete the
system within the time, the city reserved the right to
provide the same, after five days' notice in writing
first being given the contractor, to finish the work,
and the expense to be deducted from the amount of
the contract price. The contractor was to provide at
his own costs and charges, all manner of material,
labor, and implements of every description for the due
performance of the contract. It was further provided
that, should any dispute arise respecting the con-
struction or meaning of the drawings or specifications,
the same should be decided by the city engineer of the
party of the first part, which decision should be final
and conclusive. The contract was to be completed ac-
cording to the specifications on or before the 1st day
of June, 1892. The specifications required that the
pipe should be of the best quality of vitrified iron-
stone, salt-glazed; that it should have a true circular
bore, should be straight, and free from warps or other im-
perfections; also, that the material used around the pipe
for not less than twelve inches above the pipe should
be free from stone or other hard, coarse substance;
that, where the excavation was through coal or gravel,
the material used around the pipe should be screened
through a sieve, and such as the engineer might ap-
prove of, each joint to be well and thoroughly cemented
with best Portland cement one part, and two parts clean,
sharp sand. They provide that the cement should be
put in the joints by the hands, and not by trowels or
sticks; that great care should be taken not to force the

cement through the joints to the inside of the pipe. The specifications were lengthy and definite.

During the fore part of the month of June, the city council of the city of North Yakima passed an ordinance provided for in the contract, that they would take charge of the work, and did take charge of the same, and finish the same; whereupon the contractor (the appellant herein) brought an action against the city for damages, alleging the making, execution, and delivery of the contract; that, under the contract, he entered upon the construction of the said sewerage system, and provided necessary, suitable, and sufficient material for the construction of the same, and was proceeding to complete the same, until he was interfered with and stopped by the respondent; that in undertaking to carry out the contract, he incurred a large expenditure, to wit, the sum of $30,372; that he would have fully completed said system in accordance with said contract, plans, specifications and drawings at a further expenditure of not more $4,000; but that the defendant, by its officers and servants, hindered, delayed and prevented the complete performance of said contract by sundry wrongful acts, setting them forth specifically.

Among the facts which were necessary to the determination of the questions involved in this cause, the most pertinent ones were that the defendant, by its city engineer and others, wrongfully rejected large quantities of pipe furnished by the plaintiff, and refused to permit the plaintiff to lay or use the same, notwithstanding all such pipe fully complied with the contract and specifications; that the defendant, by its officers, on sundry occasions capriciously refused to allow the use by the plaintiff of suitable materials, and, after causing said delay, allowed the same mate-

rials to be used, and approved the same, and capriciously interfered with the plaintiff's labors on said work; that on or about the 16th day of June, 1892, the defendant, by its officers, wrongfully and forcibly prohibited and prevented the plaintiff from further working on said contract; that plaintiff has fully performed all the conditions of said contract, except in so far as he has been prevented by the wrongful acts on the part of the defendant; and that, by such reason, he is damaged in the sum of $10,000, and alleges damages for extra work, etc., which swell the amount claimed to $29,918.33, for which sum he asks judgment.

The defendant, by its answer, admits the making of the contract, payment mentioned by the plaintiff in his complaint, and admits extra work done by the plaintiff to the amount of $824, and admits the presentation to and the disallowance of the plaintiff's claim by the city council, but denies each and every other allegation of the complaint; and for an affirmative defense, and by way of counterclaim, alleges that plaintiff failed and refused to comply with the terms of the contract to complete such work according to the plans and specifications in many particulars, among which were that he did not properly cement the joints of the pipe, that they were laid in a defective manner, so that they leaked, and rendered the sewer system liable to generate gas, which was liable to cause explosions, etc., by which the defendant claimed to be damaged in the sum of $2,000; alleges that the plaintiff did not furnish the quality of pipe provided for by the specifications; that the same was not the best quality, not properly vitrified, not salt-glazed, and was not of true circular bore and free from warps, but was wholly unfit for the work, and that, by reason of such failure on the

part of the plaintiff, defendant was damaged in the
sum of $10,000; alleges that the plaintiff failed and re-
fused to employ skilled mechanics to lay such pipe, to
the damage of defendant in the sum of $500, and,
among other failures on the part of the plaintiff to
comply with the terms of the contract as alleged, that,
during all the time that plaintiff was carrying on said
work, he was fraudulently contriving to and did put
in defective pipe, which had been rejected by the city
engineer, which was unfit for said work, and not ac-
cording to the plans and specifications, and that he
refused to supply skilled mechanics for laying said
pipe, refused to lay the same according to the plans
and specifications, and neglected and refused to con-
struct said system in accordance with the contract,
plans, and specifications; alleges that a large number of
defective joints of pipe were laid by the plaintiff, which
defendant was compelled to and did excavate, and dis-
cover such defective joints, and repair the same; that,
at the time defendant took charge of said work, the
plaintiff was unlawfully and wrongfully, by violence
and force, using pipe for said sewer which had been
rejected by the city engineer, and which was unfit for
use in said sewer, the same being defective, and not
conforming to the contract, plans, and specifications,
which was well known to the plaintiff.

On the trial of the cause, the jury rendered a verdict
for the defendant. Judgment was rendered upon the
verdict, and from said judgment an appeal is taken to
this court.

We have with great care and much labor examined
the record in this case, which comprises nearly 1,000
pages of testimony. The case was tried with great
ability, both by counsel for the appellant and the re-
spondent, and many days were consumed by the court

in the trial. Many errors are alleged and stoutly contended for by the appellant, but there are a few plain propositions, which are suggested by the respondent, which we think are decisive of this case.

In the first place, the payment to the contractor was made conditional upon a certificate by the city engineer. This certificate was never obtained, and, in order to escape the responsibility from this portion of the contract, the burden is upon the appellant to show that it was withheld through the fraud or capriciousness of the engineer. In the case of *Craig v. Geddis*, 4 Wash. 390 (30 Pac. 396), this court, in passing upon this question, said:

"What is the proper rule as to the necessity and force of the architect's certificate under contracts of this kind? That the provision of the contract requiring such certificate should be given force is too clear for argument, and is not denied, as we understand it, by the respondents. If, however, the law of such cases justifies the instruction given by the court in this case [the court instructed the jury that if they found that the contract had been substantially complied with by the respondents, and that a certificate of due performance had been demanded, these facts of themselves would authorize them to find that the architect had wrongfully withheld the certificate, and that, under such circumstances, recovery could be had without it], we are unable to see that any substantial benefit to either party can be derived from requiring such certificate. Without such provision, the respondents, to have recovered upon the contract, would have been required to show a substantial compliance therewith on their part, or some acts on the part of the appellant excusing them from such performance; and as, under the instruction of the court, as above stated, that was all they were required to show, with such provision in the contract, it follows that said instruction deprived appellant of any and all benefit from such provision."

And so in this case, if the appellant could recover upon showing a substantial compliance with his contract, in the absence of the certificate required by the contract, the effect would be to annul and render useless to the respondent that portion of the contract which required the certificate of the engineer.

We do not think that the testimony in this case will warrant the conclusion that the refusal of the engineer to furnish the certificate required was prompted by fraud, malice or capriciousness. The testimony shows that during the entire work there were many disputes between the engineer and the contractor on questions of judgment, and as, under the agreement, the work was to be done according to the judgment of the engineer, there was nothing for the contractor to do but to submit his judgment to that of the engineer. This submission of his judgment was one of the things that he contracted to do, and it was probably as important a thing in the minds of the city council as any other thing embraced in the contract. In *Hanley v. Walker*, 79 Mich. 607 (45 N. W. 57), it was held that where a contract by plaintiffs for plastering provides that, before payment can be demanded, plaintiffs must obtain the certificate of approval of specified architects, their failure to obtain such certificate is a defense to an action on the contract, in the absence of fraud or collusion on the part of the architects and defendant; and it was also held that defendant's taking possession of the premises after plaintiffs quit work was not a waiver of the condition requiring plaintiffs to obtain the architect's certificate before they were entitled to payment.

The city had a right to demand a strict compliance with the specifications. The plaintiff agreed to do the work strictly in accordance with the plans and speci-

fications for the sum accepted.   The testimony in this case plainly shows that the contractor insisted frequently upon supplying material different from that which was contracted for, and upon doing the work in a manner different from that which was specified in the contract.   It is not sufficient for him to say that the material substituted is as good as that which was specified.   The question of quality was determined by the contract.   It must be presumed that all these questions had been in the minds of the contracting parties, had been discussed by them, and that the kind of material which they concluded was best for the purpose was the kind which was specified.   They had a right to have all such questions as that settled and determined before the contract was entered into.   They *were* settled and determined by the contract, and the contractor has no right now to have the question of the relative worth of material litigated.   It was for the very purpose of preventing litigation on this question, and of preventing the subjection of their judgment to the judgment of a jury, that these specifications were made; and in this case outside of any certificate of the engineer, the city would have the right to the kind of material for which they contracted, and to have the material placed in the sewer in the manner in which they contracted.   But here they have a special right to have the question of the kind of materials, and the manner in which the material is used, submitted to the judgment of the agent whom they appointed for that purpose; and, if the contention of the appellant is to prevail, the result would be that, instead of these matters being submitted to the opinion of their agent, they are to be submitted to the opinion of the jury,— the very thing which they sought to obviate by their contract.

But there is another proposition which precludes the appellant from recovering in this case at all. It was determined in *Dermott v. Jones*, 2 Wall. 1, that, where a contractor has been guilty of fraud, he cannot recover in any form of action. The evidence in this case is overwhelming that the contract was not substantially complied with. The specifications required that the pipe should be of the best quality of vitrified, ironstone, salt-glazed pipe; that it should have a true circular bore, and should be straight and free from warps and other imperfections. The process of vitrification and the results flowing from it were described with a great deal of technical learning, both by witnesses and counsel, in the trial of the cause; and it seemed to be conceded that the vitrification of the pipe was necessary, outside of the fact that such quality of pipe was called for by the contract. That this pipe was not thoroughly vitrified is plainly evident from the testimony, not only of the engineer, but many witnesses who showed themselves competent experts. It is true that there was some conflict of testimony on this subject; but we think that the great weight of testimony, both as to number and experience, was to the effect that the pipe was not thoroughly vitrified, or, at least, that a great deal of it was not; and the jury were perfectly justified in coming to the conclusion, which they no doubt did, that the pipe did not meet the requirements of the contract in this particular. The contract also provided that the gravel placed upon the pipe for a foot above the same should be screened; also, that, where the concrete was used, it should be one part of cement and two of sand. It plainly appears from the testimony and overwhelmingly appears, that these provisions of the contract were disregarded, and that the contractor instructed

his men to use five or six shovels of sand to one of cement; that he refused to screen the gravel that was thrown upon the pipe; and that in many instances he himself hurled down large stones, as large as a man's head, upon the pipes, injuring them, and sometimes cracking them; that when he was expostulated with by the engineer or by the inspectors, he would curse and damn them; that when the engineer called his attention on one occasion to the fact that he should screen the gravel, and that the contract provided for it, his answer was: " To hell with the contract. I will do this work as I please. Damn you." In fact, the record is full of these and much more profane and vulgar expressions on the part of this contractor when his attention was called to the violation of the contract in any particular. Many of the witnesses testified to these expressions,—witnesses who were seemingly disinterested, some of whom were working for the contractor, and some of whom were working for the city; so that the conclusion cannot be escaped from the whole testimony in this case that the contractor not only failed to substantially comply with the contract, but that he deliberately planned to escape the responsibilities of the contract, by furnishing inferior materials and inferior workmen to place the materials in the ground.

It is claimed on the part of the appellant that the city is estopped from raising these questions for the reason that their engineer accepted a portion of this contract, and allowed the contractor to proceed in the manner in which it is alleged that he did. It, doubtless, would have been better if the work had been stopped before it was; but the engineer was evidently attempting to get along with the contractor as well as he could, yielding in many instances to prevent

trouble.  This yielding disposition on the part of the engineer, it seems to us, from the testimony, encouraged the contractor to still further disregard the rights of the city, until he became so absolutely disregardful of the specifications that the engineer could no longer submit to his actions.  Besides, it appears that much of this illegal work and illegal material was placed in the system clandestinely.  The testimony shows that during the month of January the pipe was tolerably good; that in February it was not quite so good; that in March it was still a little worse; that in April it was getting still worse; and that in May it was still worse. This was the testimony of Mr. Stewart, who was the foreman of the contractor during this work; and the foreman testifies that the rejections by the engineer were increasing all the time during these months. He also states that Mr. Schmidt, the contractor told him to "work in" these rejected pipes whenever he could, and that, in obedience to said command, he did work them in.  He testified that it was a pretty hard matter frequently to run them in, because the inspectors were watching them so closely.

The following excerpt from his testimony will show somewhat the condition of things.  In speaking of the rejected pipe, the answer was:

"*Answer:* Well, there was some of them put down on this side by Captain Thomas's.

" *Question:* How much would you think?  A. Oh, I didn't count them.  It was a pretty hard matter to run them, because they were watching us pretty close. McCafferty was sitting right there over the pipe, and I had not much chance.

"Q. Then, as you got along, you run them occasionally?  A. Yes, sir.

"Q. How many pipe do you think you did that way? A. Oh, some days I would run in one or two.  Of

course, I was working for. Schmidt's interests, and I run them whenever I could.

"Q. These were his orders, I believe you said?  A. Yes, sir."

These rejected pipe were marked "Rejected" by the engineer with red chalk; so that there was no question about the workmen knowing what pipe were rejected, and what were not.   The witness continuing, says:

"We went on until the pipe got to coming so bad that they could not use them any more.   They were sending such pipe to put in here that it was no use to try to put them in any more.

"Q. Now, did you have any conversation with Mr. Schmidt about the quality of pipe that was coming? A. 1 asked him once what was the reason that he did not stop it, and try to get some good pipe; that there was no use in trying to get in some that we had there then.

"Q. What did he say?  A. He told me to keep still, and not say anything about it."

The same witness testified that the cementing was not done according to specifications, and that Schmidt directed the men, in mixing the sand and cement, to put in all the sand that they could get, and, in answer to the question, "How much sand was put in?" the witness says:   "Oh, it run from two to three and four or five shovelfuls to one of cement; just according to how the inspectors were watching."   Another witness testified that he saw Schmidt taking pipe that was rejected from one part of the work, rubbing off the rejected mark, and hauling it to another part of the work to be used in the sewer.   Another witness (who was an inspector) testified that he would have to have a dozen pair of eyes to keep the workmen from using rejected pipe, or from using too much sand, or from improperly using the cement on the joints.   In fact,

without further particularizing, there were so many unimpeached witnesses who testified to the manner in which this work was done, and the manner in which the contractor treated the inspectors, frequently threatening to throw them out of the ditches or to break their necks if they interfered with his work, and in some instances intimidating them to such an extent that they would not continue work, that the jury were justified in concluding, and no doubt did conclude, that the contractor (the appellant here) had been guilty of gross fraud in the attempted performance of his contract, and that the city was justified under the contract in removing him from the work, and that much of the damage which was done was not ascertainable until after his removal, when it was found that it would become necessary to remove the rejected pipe which he had clandestinely inserted, and to do over a portion of the work which he had done. The engineer, in answer to the question why he did not furnish the certificate, said:

" Well, because sometimes it was impossible to tell whether the cementing of the joints had been done properly. It was impossible to tell whether it was standard weight of pipe, or whether the work was well done or not. I had no way of ascertaining until the work had been completed, and I had tested it. I was not satisfied with it. I was afraid that it was defective along the line."

And investigations afterwards showed that the fears of the engineer were justified.

We think, first, that there was no substantial compliance with the contract upon which the certificate of the engineer could be rightfully demanded; and, second, that the testimony shows that the contractor had been guilty of such fraud as would prevent him from suing on the contract at all.

We have examined the instructions given by the court, and the exceptions taken to the same, and the instructions which were asked for by the appellant and refused by the court.   We think the instructions were as favorable to the appellant as they should have been, and that his failure to recover before the jury was on account of the overwhelming weight of testimony against him on the facts involved in the case.

The judgment will, therefore, be affirmed.

HOYT, C. J., and SCOTT, ANDERS and GORDON, JJ., concur.